**In re Fred STEPHENSON, Debtor.**

**Roger GORDON, Trustee of the Gordon Sand & Gravel, Inc. Defined Benefit and Plan Trust, Plaintiff,**

**v.**

**Fred STEPHENSON, Defendant.**

**Bankruptcy No. 92–13540–A7.
Adv. No. 93–90235–A7.**

United States Bankruptcy Court,
S.D. California.

April 15, 1994.

Todd R. Gabriel, Los Angeles, CA, for plaintiff.

Craig Dwyer, San Diego, CA, for debtor/defendant.

### *OPINION*

GEORGE BRODY, Bankruptcy Judge.

This is an action to except a debt from discharge pursuant to 11 U.S.C. § 523(a)(4) and (a)(6). This Court has jurisdiction over this proceeding pursuant to 28 U.S.C.

§ 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## FACTS

Roger Gordon (plaintiff) owned Gordon Sand & Gravel, Inc. In 1986 he instituted a pension retirement plan for himself and his employees and designated himself as trustee. The Gordon pension plan was drafted by Fred Stephenson (debtor). The debtor was the owner and president of Fred L. Stephenson & Company, a company specializing in pension administration and real estate investment syndication.

In the Fall of 1988, the debtor attempted to form a syndicate to raise $400,000 for Intercal Equities Inc. (Intercal), a partnership controlled by Dale Stein (Stein) and Dale Johnson (Johnson), to help finance a development in Bonita, California (Bonita). The plaintiff agreed to invest $115,000.00 of his pension funds in the Bonita project.

The debtor deposited investor funds into a newly created entity named the Stephenson Loan Fund Partnership # 3. When sufficient investments were accumulated to finance the Bonita loan, the debtor turned the funds over to Intercal. To evidence the loan, Intercal executed a promissory note for $400,000 made payable to the Stephenson Loan Fund Partnership # 3. To secure the payment of the note, Intercal executed a trust deed naming the Stephenson Loan Fund Partnership # 3 as beneficiary. The promissory note was payable in 18 months and bore interest at 16% per annum. An addendum to the promissory note listed the investors and their individual contributions.

The loan to Intercal was also personally guaranteed by Stein and Johnson. When the loans were made, Johnson and Stein each possessed $7–$8 million dollars equity in various properties. Since the plaintiff's contribution was essential to the syndication's success, the debtor offered the plaintiff a $3,000 commission as an inducement to procure his participation.

Sometime late in November or early December of 1989, the debtor called plaintiff and advised him that Intercal was going to pay off the loan and asked him if he would be interested in another investment. Subsequently, the plaintiff and debtor met to discuss investment opportunities including a transaction similar to the Bonita deal. The new transaction would be structured so that plaintiff and other investors would lend Intercal $350,000 which would be secured by a trust deed on unimproved commercial real property owned by Intercal in Poway, California (Poway loan). Another partnership, the Stephenson Loan Fund Poway Partnership, would be formed to administer the Poway loan. The debtor told plaintiff that many of the Bonita investors were "rolling over" their investment into the Poway loan.

Approximately one week after the meeting, the plaintiff tried to call the debtor. Unable to reach the debtor after several calls, the plaintiff explained to the debtor's secretary that he did not want to invest in the Poway project and wanted the debtor to return his $115,000. The debtor's secretary informed the plaintiff that it was too late; his money was already invested in the Poway project. Disturbed and concerned, the plaintiff finally reached the debtor and demanded the return of the $115,000. The debtor explained to the plaintiff that he would return his investment as soon as he was able to find a replacement investor. A letter from the debtor to plaintiff dated April 3, 1990 documented this conversation.

The debtor made investment capital available to Stein and Johnson for about 12 to 15 projects over a period of 7 or 8 years prior to the Bonita deal. The debtor never investigated the soundness of any investment. The debtor never obtained appraisals or determined what encumbrances were on the property; nor did he obtain any other pertinent information. Thus, the debtor was unaware that the Poway property was encumbered by a first trust deed that secured a $285,000 obligation and that the property had been conditionally sold for $650,000.00 to a buyer who intended to build an automobile dealership on the property. The sale was conditioned upon the buyers being able to fulfill certain conditions imposed by the City of Poway. The buyers were unable to do so and the sale was never consummated. The Poway property plummeted in value and was

156

sold for $400,000 in June 1991. After payment to the first trust deed holder and costs of sale, the Stephenson Loan Fund Poway Partnership received a return of $42,827.57 for their $350,000 investment, of which the plaintiff received $14,006.07.

With the real estate market depressed, Intercal, Stein and Johnson encountered financial difficulties. The paper equity Stein and Johnson had amassed was wiped out and they both filed bankruptcy, making their personal guarantees worthless. Plaintiff, in addition to the $14,006.07 distribution from the sale of the property, received $15,333.30 in interest and $6,000 in commissions on both loans. Accordingly, the plaintiff suffered a loss of $79,660.63 attributable to the Poway investment.

In April 1992, the plaintiff filed a complaint against the debtor in Superior Court for declaratory relief, recovery of money, and an accounting. The proceeding came to trial on August 3, 1992, and a judgment for $108,586.65 was entered in favor of plaintiff. The debtor filed a Chapter 7 petition for relief on November 13, 1992. The plaintiff filed this adversary complaint on February 9, 1993, alleging that his judgment debt was nondischargeable pursuant to sections 523(a)(4) and (a)(6) of the Bankruptcy Code.[1]

The plaintiff contends that the debtor invested the money he was to receive from Intercal in repayment of his Bonita investment in the Poway project without his authorization. The plaintiff further contends that he and the debtor were partners, that partners are fiduciaries for each other, that the debtor's unauthorized investment of his money in the Poway loan was a defalcation. Therefore, the loss he suffered as a result of the unauthorized investment constitutes a nondischargeable debt under section 523(a)(4). Lastly, plaintiff contends that the debt is nondischargeable by virtue of § 523(a)(6).

The question crucial to both the 523(a)(4) and (a)(6) actions is whether the debtor in-

vested the plaintiff's pension fund money of $115,000 in Poway without plaintiff's authorization.

To fund the Poway loan for Intercal the debtor had to raise $350,000; the plaintiff's $115,000 represented about one-third of that amount. The Bonita deal had been successful and the return on the Poway investment was attractive. Under pressure to raise the capital required by Intercal, and eager to obtain his commission and not sanguine about being able to replace plaintiff's $115,000, the debtor decided to invest the plaintiff's money in Poway. The debtor gambled that the plaintiff, with confidence instilled by the success of the Bonita deal and with the attractive return offered by the Poway investment, would agree to adopt the debtor's unauthorized act.

Letters from the debtor to the plaintiff and other Bonita investors confirms the conclusion that the debtor reinvested the plaintiff's $115,000 into Poway without the plaintiff's consent. The investors who agreed to have their Bonita investment rolled over into the Poway investment received letters dated December 26, 1989, stating "Your investment in the Stephenson Loan Fund partnership has been rolled into the Stephenson Loan Fund Poway Partnership." The plaintiff did not receive this letter. Instead, the plaintiff received a letter dated the same date, which in principal part states, "Enclosed please find a check in the amount of $201.64 the interest due from November 20, 1989 to November 22, 1989. Also enclosed is a check in the amount of $1,533.33 for the period November 23, 1989 to December 22, 1989." The plaintiff's letter did not mention Poway. Rather, the letter specifically refers to the Stephenson Loan Fund Partnership # 3. The plaintiff rightfully assumed that the source of the interest payments was the Bonita loan. The plaintiff did not receive a letter stating that his investment had been rolled over into Poway for the simple reason that he did not authorize the roll over.[2]

---

1. Plaintiff filed a motion for summary judgment based upon the state court judgment on November 10, 1993. Judge Louise DeCarl Adler denied the motion.

2. In fact, the debtor rolled over the plaintiff's money into Poway even before he met with the plaintiff to discuss additional investment opportunities. The debtor met with the plaintiff in late November or early December, but made the in-

The debtor maintains that even if the Court were to find that the debtor invested the plaintiff's $115,000 in the Poway venture without the plaintiff's consent, the plaintiff ratified the investment.

"Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. [Citations omitted]. A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred,...." *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972).

After the plaintiff was advised that the Gordon pension fund money was invested in the Poway venture, the plaintiff accepted monthly interest payments and also demanded and received the $3,000 commission, the same commission that he had received for the Bonita loan. It is the debtor's contention that the acceptance of these benefits constitutes ratification.

"Voluntary retention of benefits with knowledge of the unauthorized nature of the act constitutes ratification." *Common Wealth Ins. Systems, Inc. v. Kersten*, 40 Cal.App.3d 1014, 1026, 115 Cal.Rptr. 653 (1974); *See also Alvarado Community Hospital v. Superior Court*, 173 Cal.App.3d 476, 481, 219 Cal.Rptr. 52 (1985). "It is essential, however, that the act of adoption be truly voluntary in character. [T]here can be no adoption if the act although voluntary, is done only because the purported principal is obligated to minimize his losses caused by the agent's wrongful act ..." *Rakestraw*, 8 Cal.3d at 73, 104 Cal.Rptr. 57, 500 P.2d 1401. The plaintiff accepted the interest payment and commission to minimize the pension fund's losses caused by the debtor's wrongful act until the debtor could find a replacement investor. He did not accept such payments with any intent to adopt the debtor's unauthorized act.

Moreover, "[r]atification is the acceptance of the result of an act, with an intent to ratify, and with full knowledge of all material circumstances." *Federal Deposit Insurance Corp. v. Staudinger*, 797 F.2d 908, 911 (10th Cir.1986); *Chastain v. Belmont*, 43 Cal.2d 45, 58, 271 P.2d 498 (1954); *see* Civ.Code, § 2314; 1B Witkin, Summary of California Law, *Agency*, § 39, p. 51 (9th ed.1987); *Dufresne v. Elite Ins. Co.*, 26 Cal.App.3d 916, 103 Cal.Rptr. 347 (1972).

In undertaking to raise investment capital for Intercal, the debtor was acting as a real estate broker and real property securities dealer[3]. Real estate brokers and real prop-

---

vestment of plaintiff's $115,000.00 on November 23, 1989, the day after the repayment of the Bonita loan, sometime before he met with the plaintiff to discuss the additional investment opportunities.

3. Cal.Bus. and Prof.Code § 10131 states:
A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: ...
(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity ...
Cal.Bus. & Prof.Code § 10237 states in relevant part:·
A real property securities dealer within the meaning of this article is any person, acting as principal or agent, who engages in the business of:

(a) Selling real property securities as defined by subdivision (a) or (b) of Section 10327.1 to the public ...
Cal.Bus. & Prof.Code § 10237.1 states in relevant part:
The term real property security as used in this article means:
(a) An agreement made in connection with the arranging of a loan evidenced by a promissory note secured directly or collaterally by a lien on real property.... wherein the real property securities dealer or his principal expressly or impliedly agrees to do any of the following:
1. Guarantee the note or contract against loss at any time, or
2. Guarantee that payments of principal or interest will be paid in conformity with the terms of the note or contract, or

\*  \*  \*  \*  \*  \*

5. Guarantee a specific yield or return on the note or contract, ...

\*  \*  \*  \*  \*  \*

7. Repurchase the note or contract.

erty securities dealers are required under California Business and Professional Code ("Cal.Bus. and Prof.Code") § 10232.4 to provide each prospective lender with a disclosure statement of the material facts of the proposed transaction before the lender is obligated to make the loan. Section 10232.-4(c) states:

> When the broker has custody of funds of a prospective lender ... which were received and are being maintained with the express permission of the owner and in accordance with law, and the broker retains the funds in an escrow ... fund account pending receipt of the owner's express written instructions to disburse the funds for a loan ... the broker shall cause the disclosure statement to be delivered to the owner and shall obtain the owner's written consent to the proposed disbursement before making the disbursement.

The disclosure statement must contain "[p]ertinent information concerning all the encumbrances which constitute liens against the securing property...." Cal.Bus. and Prof.Code § 10232.5(a)(6).

The debtor did not provide the plaintiff with a statement disclosing the material facts regarding the Poway investment. The debtor never provided the plaintiff with any information concerning the encumbrances on the property nor did not obtain the plaintiff's written consent to the proposed disbursement of the plaintiff's funds. Since all material facts of the Poway investment were never made available to the plaintiff, there was no ratification.[4]

Therefore, the question that the Court must address is whether the unauthorized investment of the plaintiff's pension fund monies creates a nondischargeable debt by virtue of section 523(a)(4) and (a)(6).

## A. *Section 523(a)(4)*

Section 523(a) of the Bankruptcy Code provides in relevant part:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> $*$ $*$ $*$ $*$ $*$ $*$
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> $*$ $*$ $*$ $*$ $*$ $*$

Plaintiff contends that he and the debtor were partners; that partners are fiduciaries for each other, *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986); *In re Stanton*, 38 B.R. 746 (9th Cir. BAP 1984), *appeal dismissed*, 766 F.2d 1283 (9th Cir.1985); *In re Aubrey*, 111 B.R. 268 (9th Cir. BAP 1990); and that the unauthorized investment of the plaintiff's pension fund money in Poway by the debtor was a "defalcation." Thus, the plaintiff alleges that the pension funds lost in that investment constitutes a nondischargeable debt within the meaning of § 523(a)(4).

To establish that the plaintiff and the debtor were partners, the plaintiff relies upon the fact that the debtor formed the Stephenson Loan Fund Partnership # 3 to administer the Bonita loan and designated himself as managing partner of the fund. However, the fact that debtor characterized

---

Section 10237.25(a) states that sales of real property securities to pension and retirement funds are generally not deemed sales to the public for the purposes of the statute. However, Section 10237.25(b) states a sale to a self-employed retirement fund will be deemed a sale to the public, unless the fund is "for the exclusive benefit of an individual who is a real estate broker licensee, general building contractor licensee, or attorney." Virtually all the investors in both the Bonita and Poway projects, including plaintiff, were self-employed retirement funds. Thus, the debtor's activities on behalf of Intercal were those of a real property securities dealer as well as a real estate broker.

4. The debtor contends that these requirements are not applicable to him since he does not have

a broker's license. This contention is frivolous and merits no discussion. The purpose of Section 10237 et seq. is to protect the public from the sale of worthless real estate securities by requiring a real property securities dealer to fully investigate the proposed investment and fully disclose all material factors to the potential investor. *See, People v. Mancha*, 39 Cal.App.3d 703, 114 Cal.Rptr. 392 (1974). Had the debtor complied with the requirements of the statute it is likely the investors in the Poway loan would not have suffered the loss they did. The debtor may not now escape the consequences of his conduct by failing to obtain the license he was required to obtain to carry out the functions he undertook.

the investment fund as a partnership does not make it a partnership. "It is in fact the nature of the relationship, if any, intended or actually created, rather than the title which controls." *Louis Lesser Enterprises, Ltd. v. Roeder,* 209 Cal.App.2d 401, 408, 25 Cal.Rptr. 917 (1962); *See also Commissioner v. Culbertson,* 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949). The partnership was not organized for any business purpose. The partnership format was adopted solely for administrative convenience to permit the debtor as managing partner to authorize modifications of the terms and conditions of the loan without the consent of each individual investor.

■ However, while the debtor and plaintiff were not partners, other grounds exist to establish a fiduciary relationship between debtor and plaintiff. The meaning of "fiduciary capacity" under § 523(a)(4) is a question of federal law. *In re Martin,* 161 B.R. 672, 676 (9th Cir. BAP 1993). "The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context, ordinary commercial relationships are excluded from the reach of section 523(a)(4)." *In re Short,* 818 F.2d 693, 695 (9th Cir.1987). Constructive, resulting or implied trusts are excluded, but statutory trusts are not. *Id.; In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981). Thus, a fiduciary relationship for purposes of § 523(a)(4) exists only where there is an express or statutory trust, *In re Aubrey,* 111 B.R. 268, 275 (9th Cir. BAP 1990), and this trust must be imposed prior to any wrongdoing. *In re Schneider,* 99 B.R. 974 (9th Cir. BAP 1989). *See also In re Baird,* 114 B.R. 198, 202 (9th Cir. BAP 1990).

The essential elements of an express trust are: "1) sufficient words to create a trust; 2) a definite subject; and 3) a certain and ascertained object or res. The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust." *In re Thornton,* 544 F.2d 1005, 1007 (9th Cir.1976). Two provisions of the Cal.Bus. and Prof.Code are relevant to the issue of whether the broker legislation creates a statutory trust.

Section 10131 provides:

A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

\*　　\*　　\*　　\*　　\*　　\*

(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity.

Section 10232.4(c) provides:

When the broker has custody of funds of a prospective lender ... which were received and are being maintained with the express permission of the owner and in accordance with law, and the broker retains the funds in an escrow ... fund account pending receipt of the owner's express written instructions to disburse the funds for a loan ... the broker shall cause the disclosure statement to be delivered to the owner and shall obtain the owner's written consent to the proposed disbursement before making the disbursement.

These sections make it clear, as previously determined, that when the debtor engaged in raising investment capital for Intercal, he was acting as a real estate broker. These provisions also identify the specific res and impose identifiable fiduciary duties on a broker.[5] Thus, the debtor was a fiduciary within the meaning of section 523(a)(4). *See In re Evans,* 161 B.R. 474 (9th Cir. BAP 1993); *In re Wooslley,* 117 B.R. 524 (9th Cir. BAP 1990); *Montoya v. McLeod,* 176 Cal.App.3d 57, 221 Cal.Rptr. 353 (1985); *Ziswasser v. Cole & Cowan, Inc.,* 164 Cal.App.3d 417, 210 Cal.Rptr. 428 (1985). *See also In re Baird,* 114 B.R. at 198.

Accordingly, if the debtor committed a defalcation while acting in his capacity as a real estate broker, the loss that plaintiff's pension

**5.** *See supra* fn. 4.

fund suffered is a nondischargeable debt under § 523(a)(4).

Under the Bankruptcy Act, "defalcation" meant "the failure of one who has received moneys in trust to pay it over as he ought." *In re Herbst,* 22 F.Supp. 353, 354 (S.D.N.Y. 1937), aff'd, 93 F.2d 510 (1937). Defalcation has the same meaning under the Bankruptcy Code. *In re Baird,* 114 B.R. at 198; *In re Martin,* 161 B.R. 672 (9th Cir. BAP 1993). After Intercal paid off its loan, the plaintiff was entitled to the return of his investment unless he agreed to some other disposition of the funds. When the plaintiff requested the return of his funds, the debtor was required to return them. Instead, the debtor invested the funds in the Poway project without authorization. The unauthorized investment clearly constitutes a "defalcation" and, therefore, the loss suffered by the plaintiff by virtue of the unauthorized investment by the debtor constitutes a nondischargeable debt under section 523(a)(4).

**B.  *Section 523(a)(6)***

■ Plaintiff also contends that his debt is nondischargeable under section 523(a)(6). Section 523(a) of the Bankruptcy Code provides that a discharge under section 727 does not discharge an individual debtor from any debt:

"(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

The legislative history to 523(a)(6) makes it clear that [t]he phrase "willful and malicious injury" covers a willful and malicious conversion. 124 *Cong.Rec.* H. 11,096 (Sept. 28, 1978); S. 17,412 (Oct. 6, 1978); *In re Penning,* 22 B.R. 616 (1982). "[T]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the meaning of § 523(a)(6)." *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986).

After Intercal delivered the check to the Stephenson Escrow Account in repayment of the Bonita loan, the debtor held the money in that account in trust for the plaintiff and other investors. The plaintiff had the right to the possession of his $115,000 in that account. The unauthorized investment of plaintiff's money in the Poway project was an act done intentionally and without justification or excuse. Thus, the debtor's unauthorized use of the plaintiff's $115,000 was a willful and malicious injury within the meaning of § 523(a)(6) and the loss suffered by the plaintiff is also nondischargeable for this additional reason.

## *CONCLUSION*

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. An appropriate order to be submitted by counsel for plaintiff within 10 days from the date of this opinion.